UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NUMBER 18-20368-CR-WMS

UNITED STATES OF AMERICA

    vs.

FRANCEL RODRIGUEZ,

        Defendant

---

TRIAL PROCEEDINGS HELD 8-3-2018
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE

---

**APPEARANCES:**

FOR THE UNITED STATES:    CHRISTOPHER CLARK, A.U.S.A.
        99 N.E. 4th Street
        Miami, FL  33132


FOR THE DEFENDANT:    ADEBUNMI LOMAX, A.F.P.D
        CHRISTIAN DUNHAM, A.F.P.D
        150 West Flagler Street
        Miami, FL  33130


REPORTED BY:    PATRICIA SANDERS, RPR
        United States Court Reporter
        400 North Miami Avenue, Suite 11-3
        Miami, FL  33128
        *305.523.5528*
        *patricia_sanders@flsd.uscourts.gov.*

09:30  1          THE COURT:  Good morning. Is everyone ready to

09:30  2  proceed.

09:30  3          MR. CLARK: Yes, Your Honor.

09:31  4          MR. DUNHAM: Yes, Your Honor.

09:31  5          THE COURT:  We sent to the parties last night a final

09:31  6  draft of the jury instructions. Are there any objections, other

09:31  7  than those posed yesterday, any typographical errors that need

09:31  8  to be remedied or addressed?

09:31  9          MR. CLARK: No, Your Honor.

09:31  10          MS. LOMAX: No, Your Honor.

11          THE COURT:  I found a duplicate page in there this

12  morning, but I have taken that out, so the numbering is one

13  page off.

14          All right. Bring in the jury, please.

15          COURT SECURITY OFFICER:  All rise.

09:33  16          THE COURT:  Everyone may be seated. Good morning

09:33  17  ladies and gentlemen. As I told you yesterday both parties have

09:33  18  presented to you all the evidence for your consideration in

09:33  19  this matter.

09:33  20          So we are going to have the closing arguments of the

09:33  21  parties shortly, but before that I am going to give you my

09:33  22  final instructions on the law.

09:33  23          Each of will have a written copy of these instructions

09:33  24  to use during our deliberations, but right now you can just

09:34  25  listen as I present to you my final instructions on the law.

1       As I just told you, it is my duty to instruct you on

2   the rules of law that you must use in deciding this case. After

3   I have completed these instructions and you have heard the

4   closing arguments by the parties you will go to the jury room

5   and begin your discussions; what we call your deliberations.

6       And it will be your duty to decide whether the

7   Government has proved beyond a reasonable doubt the specific

8   facts necessary to find the defendant guilty of the crimes

9   charged in the indictment.

10      You must make your decision only on the basis of the

11  testimony and other evidence presented here during the trial.

12  And you must not be influenced in any way way by either

13  sympathy or prejudice for or against the defendant or the

14  Government.

15      You must also follow the law as I explain it to you

16  even if you agree with that law or not and you must follow all

17  of my instructions as a whole.  You must not single out or

18  disregard any of the Court's instructions on the law.

19      Now, the indictment or formal charge against any

20  defendant is not evidence of guilt. The law does not require a

21  defendant to prove innocence or to produce any evidence at all.

22      And if that defendant elects not to testify you should

23  not consider that in any way during your deliberations.

24      Thus, while the Government's burden of proof is a

25  strict or heavy burden it is not necessary that any defendant's

1    guilt be proved beyond all possible doubt. It is only required

2    that the Government's proof exclude any reasonable doubt

3    concerning the defendant's guilt.

4         A reasonable doubt is a real doubt based upon reason

5    and common sense after careful and impartial consideration all

6    of the evidence in the case.

7         Proof beyond a reasonable doubt therefore is proof of

8    such a convincing character that you would be willing to rely

9    and act upon it without hesitation in the most important of

10   your own affairs.

11        If you are convinced that the defendant has been

12   proved guilty beyond a reasonable doubt, say so. If you are not

13   convinced, say so.

14        You must consider only the evidence that I have

15   admitted in the case. And the term evidence includes the

16   testimony of witnesses and the exhibits admitted into the

17   record. Remember that anything the lawyers say is not evidence

18   in the case.

19        It is your recollection and interpretation of the

20   evidence that controls. What the lawyers say is not binding on

21   you.

22        In considering the evidence you must make deductions

23   and reach conclusions which reason and commonsense lead you to

24   make and you should not be concerned about whether the evidence

25   is direct or circumstantial.

09:37  1          Direct evidence is the testimony of one who asserts

09:37  2  actual knowledge of a fact; such as an eyewitness.

09:37  3

09:37  4          Circumstantial evidence is proof of a chain of facts

09:37  5  and circumstances tending to prove or disprove any fact in

09:37  6  dispute.

09:37  7          The law makes no distinction between the weight you

09:37  8  may give either to direct or circumstantial evidence.

09:37  9          Now, as I said earlier you must consider only the

09:38  10  evidence that I have admitted in the case.

09:38  11          You should decide whether you believe what each

09:38  12  witness had to say and how important that testimony was.

09:38  13          In making that decision you may believe or disbelieve

09:38  14  any witness in whole or in part. Also, the number of witnesses

09:38  15  testifying concerning any particular dispute is not

09:38  16  controlling.

09:38  17          In deciding whether you believe or do not believe any

09:38  18  witness I suggest that you ask yourself a few questions:

19          Did the witness impress you as one who was telling the

20  truth?  Did the witness have any particular reason not to tell

21  the truth?

22          Did the witness have a personal interest in the

23  outcome of the case? Did the witness seem to have a good

24  memory?

25          Did the witness have the opportunity and ability to

1    observe accurately the things he or she testified about?

2            Did the witness appear to understand the questions

3    clearly and answer them directly?

4            Did the witness's testimony differ from other

5    testimony or other evidence?

6            Now the testimony of some witnesses must be considered

7    with more caution than the testimony of other witnesses.

8            For example, a paid informer or a witness who has been

9    promised that he or she will not be charged or prosecuted or a

10   witness who hopes to gain more favorable treatment in his or

11   her own case may have a reason to make a false statement

12   because the witness wants to strike a good bargain with the

13   Government.

14        So while a witness of that kind may be entirely truthful

15   when testifying, you should consider that testimony with more

16   caution than the testimony of other witnesses.

17        You should also ask yourself whether there was evidence

18   tending to prove that a witness testified falsely concerning

19   some important fact or whether there was evidence that at some

20   other time a witness said or did something or failed to say or

21   do something which was different from the testimony the witness

22   gave before you during the trial.

23        Now you should keep in mind of course that a simple

24   mistake by a witness does not necessarily mean that the witness

25   was not telling the truth as he or she remembers it because

09:40  1    people naturally tend to forget some things or remember other

09:40  2    things inaccurately.

09:40  3

09:41  4        So if a witness has made a misstatement you need to

09:41  5    consider whether it was simply an innocent lapse of memory or

09:41  6    an intentional falsehood.

09:41  7        And the significance of that may depend on whether it has

09:41  8    to do with an important fact or with only an unimportant

09:41  9    detail.

09:41  10       Now, at this time I will explain the indictment which

09:41  11   charges the defendant Francel Rodriguez with four separate

09:41  12   offenses called counts.

09:41  13       I am not going to read the indictment to you at length

09:41  14   because you will have a copy of the indictment to reference

09:41  15   during your deliberation.

09:41  16       In summary Count 1 charges that defendant Francel

09:41  17   Rodriguez conspired knowingly and willfully together with

09:41  18   others known and unknown to commit health care fraud and wire

09:41  19   fraud.

09:41  20       Counts 2 through 4 charge that on the dates specified in

09:41  21   the indictment defendant Francel Rodriguez knowingly and

09:42  22   willfully executed a scheme and artifice to defraud a

09:42  23   Healthcare Benefit program.

09:42  24       Count 1 charges the defendant Francel Rodriguez with

09:42  25   violating Title 18 United States Code Section 1349 which makes

it a separate Federal crime or offense to conspire or agree with someone else to do something which if actually carried out would amount to another Federal crime or offense.

So under this law a conspiracy is an agreement or a kind of partnership in criminal purpose in which each member becomes the agent or partner of every other member.

In order to establish a conspiracy offense it is not necessary for the Government to prove that all of the people named in the indictment were members of the scheme or that those who were members had entered into any formal type of agreement.

Or that the members had planned together all of the details of the scheme that the indictment charges would be carried out in an effort to commit the intended crime.

Also, because the essence of a conspiracy offense is the making of the agreement itself it is not necessary for the Government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.

What the evidence in this case must show beyond a reasonable doubt is, first, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment.

And, second, that the defendant knowing the unlawful purpose of the plan willfully joined in it.

A person may become a member of a conspiracy without knowing all the details of the unlawful scheme and without knowing who all of the other members are.

So if a defendant has a general understanding of the unlawful purpose of the plan and knowingly and willfully joins in that plan on one occasion that is sufficient to convict that defendant for conspiracy even though the defendant did not participate before and even though the defendant played only a minor part.

Of course, mere presence at the scene of a transaction or event or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests does not necessarily establish proof of a conspiracy.

Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one does not thereby become a conspirator.

Now Title 18 United States Code Section 1343 makes it a Federal crime to use Interstate, wire, radio or television communications to carry out a scheme to defraud someone else.

A defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt: One, the defendant knowingly devised or participated in a scheme to defraud or to obtain money or property by using false pretenses, representations and promises.

09:45   1       Two, the false pretenses representations or promises were

09:45   2   about a material fact.

09:45   3

09:45   4       And, three, the defendant acted with the intent to

09:46   5   defraud.   And finally, four, the defendant transmitted or

09:46   6   caused to be transmitted by wire some communication in

09:46   7   Interstate Commerce to help carry out the scheme to defraud.

09:46   8       The term scheme to defraud includes any plan or course of

09:46   9   action intended to deceive or cheat someone out of money or

09:46   10  property by using false or fraudulent pretenses representations

09:46   11  or promises.

09:46   12      A statement or a representation is false or fraudulent if

09:46   13  it is about a material fact that the speaker knows is untrue

09:46   14  or makes with reckless indifference to the truth and makes with

09:46   15  the intent to defraud.

09:46   16      A statement or representation may be false or fraudulent

09:46   17  when it is a half truth or effectively conceals a material fact

09:47   18  and is made with the intent to defraud.

09:47   19      A material fact is an important fact that a reasonable

09:47   20  person would use to decide whether or not to do something. A

09:47   21  fact is material if it has the capacity or natural tendency to

09:47   22  influence a person's decision.

09:47   23      It doesn't matter whether the decision-maker actually

09:47   24  relied on the statement or knew or should have known that the

09:47   25  statement was false.

The intent to defraud is the specific intent to deceive or cheat someone; usually for personal financial gain or to cause financial loss to someone else.

The Government does not have to prove all of the details alleged in the indictment about the precise nature and purpose of the scheme.

It also does not have to prove that the material transmitted by Interstate wire was itself false or fraudulent; or that using the wire was intended as the specific or exclusive means of carrying out the alleged fraud or that the defendant personally made the transmission over the wire.

And it does not have to prove that the alleged scheme actually succeeded in defrauding anyone.

To use Interstate wire communication is to act so that something would normally be sent through wire, radio or television communication in the normal course of business.

And each separate use of the Interstate wire communications as part of the scheme to defraud would be a separate crime.

Those are my instructions as to Count 1 with regard to the conspiracy.

Counts 2 through 4 allege that the defendant Francel Rodriguez committed health care fraud.

Title 18 United States Code Section 1347 makes it a Federal crime to knowingly and willfully execute or attempt to

execute a scheme or artifice to defraud a Healthcare Benefit program or to get any of the money or property owned by or under the custody or control of a Healthcare Benefit program by means of false or fraudulent pretenses, representations or promises.

A defendant can be found guilty of the offense of health care fraud only if all the following facts are proved beyond a reasonable doubt:

One, that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a Healthcare Benefit program by means of false or fraudulent pretenses, representations or promises.

Two, the Healthcare Benefit program affected Interstate Commerce.

Three, that the false or fraudulent pretenses, representations or promises related to a material fact.

Four, the defendant acted willfully and intended to defraud.

And, five, the defendant did so in connection with the delivery of or payment for health care benefits, items or services.

Healthcare Benefit program means any public or private plan or contract affecting commerce under which any medical benefit, item or service is provided to any individual.

And includes any individual or entity who is providing a

medical benefit, item or service for which payment may be made under the plan or contract.

Blue Cross and Blue Shield of Florida is a Healthcare Benefit program as defined by Title 18 United States Code Section 24 B.

A health care program affects Interstate Commerce if the health care program had any impact on the movement of any money, goods, services or persons from one state to another.

The Government need only prove that the health care program itself either engaged in Interstate Commerce or that its activity affected Interstate Commerce to any degree.

The Government need not prove that the defendant engaged in Interstate Commerce or that the acts of the defendant affected Interstate Commerce.

A scheme to defraud includes any plan or course of action intended to deceive or cheat someone out of money or property.

Again, by using false or fraudulent pretenses, representations or promises related to a material fact.

And, again, a statement or representation is false or fraudulent if it is about a material fact that the speaker knows is untrue or makes with reckless indifference as to the truth and makes with the intent to defraud.

A statement or representation may be false or fraudulent when it is a half truth or effectively conceals a material fact

and is made with the intent to defraud.

A material fact is an important fact that a reasonable person would use to decide whether or not to do something.

And a fact is material if it has the capacity or natural tendency to influence a person's decision.

It does not matter whether the decision-maker actually relied on the statement or knew or should have known that the statement was false.

To act with intent to defraud means to do something with the specific intent to deceive or cheat someone; usually for personal gain or to cause financial loss to someone else.

The Government does not have to prove all of the details in the indictment about the precise nature or purpose of the scheme.

It also does not have to prove that the alleged scheme actually succeeded in defrauding anyone. What must be proved beyond a reasonable doubt is that the defendant knowingly attempted or carried out a scheme substantially similar to the one alleged in the indictment.

Now defendant Francel Rodriguez is also charged in Counts 2 through 4 of the indictment with aiding and abetting the commission of the offenses of health care fraud.

The guilt of a defendant in a criminal case may be proved without evidence that the defendant personally did every act involved in the commission of the crime charged.

 1        The law recognizes that ordinarily anything a person can

 2   do for one's self may also be accomplished through direction of

 3   another person as an agent or by acting together with or under

 4   the direction of another person or persons in a joint effort.

 5   So, if the acts or conduct of an agent, employee or other

 6   associate of the defendant are willfully directed or authorized

 7   by the defendant, or if the defendant aids and abets another

 8   person by willfully joining together with that person in the

 9   commission of a crime, then the law holds the defendant

10   responsible for the conduct of that other person just as though

11   the defendant had personally engaged in such conduct.

12        However, before any defendant can be held criminally

13   responsible for the conduct of others it is necessary that the

14   defendant willfully associate in some way with the crime and

15   willfully participate in it.

16        Mere presence at the scene of a crime and even knowledge

17   that a crime is being committed are not sufficient to establish

18   that a defendant either directed or aided and abetted the

19   crime.

20        You must find beyond a reasonable doubt that the

21   defendant was a willful participant and not merely a knowing

22   spectator.

23        When knowledge of the existence of a particular fact is

24   an essential part of an offense, such knowledge may be

25   established if the defendant is aware of a high probability of

its existence, unless the defendant actually believes that it does not exist.

So, with respect to the issue of the defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the defendant believed that he participated in a scheme or artifice to defraud Blue Cross and Blue Shield of Florida and deliberately and consciously tried to avoid learning that there was a scheme or artifice to defraud Blue Cross and Blue Shield in order to be able to say, if apprehended, that he was unaware of the scheme to defraud Blue Cross and Blue Shield of Florida, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.

In other words, you may find that the defendant acted knowingly if you find beyond a reasonable doubt either the defendant actually participated in a scheme or artifice to defraud a health care benefit program; or that he deliberately closed his eyes to what he had every reason to believe was the fact.

I must emphasize, however, that the requisite proof of knowledge on the part of the defendant cannot be established by merely demonstrating that the defendant was negligent careless or foolish.

You will note that the indictment charges that the

offense was committed on or about a certain date.  The Government does not have to prove with certainty the exact date of the alleged offense.

It is sufficient if the Government proves beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

The word knowingly as that term is used in the indictment or in these instructions means that the act was done voluntarily and intentionally and not because of mistake or accident.

The word willfully as that term is used in the indictment or in these instructions means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law.

Good faith is a complete defense to the charge that requires intent to defraud. A defendant is not required to prove good faith.

The Government must prove intent to defraud beyond a reasonable doubt. An honestly held opinion or an honestly formed belief cannot be fraudulent intent even if the opinion or belief is mistaken.

Similarly, evidence of a mistake in judgment and error in management or carelessness can't establish fraudulent intent.

But an honest belief that a business venture would

ultimately succeed does not constitute good faith if the defendant intended to deceive others by making representations the defendant knew to be false or fraudulent.

A separate crime or offense is charged in each count of the indictment.  Each charge and the evidence pertaining to it should be considered separately.

The fact that you may find the defendant guilty or not guilty as to one of the offenses charged should not affect your verdict as to any other offense charged.

I caution you, members of the Jury, that you are here to determine from the evidence in this case whether the defendant is guilty or not guilty.  The defendant is on trial only for those specific offenses alleged in the indictment.

Also, the question of punishment should never be considered by the jury in any way in deciding the case.  If the defendant is convicted the matter of punishment is for the Judge alone to determine later.

Now, you have been permitted to take notes during the course of the trial.  Most of you -- perhaps all of you -- have taken advantage of that opportunity.

You must use your notes only as an aid to your memory during your deliberations. In other words, you must not give your notes any priority over your independent recollection of the evidence.

And you must not allow yourself to be unduly influenced

by the notes of other jurors.  I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

Now, your verdict, whether guilty or not guilty, must be unanimous; in other words you must all agree.

Your deliberations are secret and you will never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with all the other jurors.

So, you must discuss the case with one another and try to reach an agreement. While you are discussing the case do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong.

But do not give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that in a very real way you are judges, judges of the facts, and your only interest is to seek the truth from the evidence in this case.

When you go to the jury room, you are going to choose one of your members to act as your foreperson.  The foreperson will direct your deliberations and will speak for you here in court.

A verdict form has been prepared for your convenience, and I will go over it with you at this time.

It reads as follows: United States of America versus Francel Rodriguez. We the jury unanimously find the defendant as to Count 1, conspiracy to commit healthcare fraud and wire fraud; guilty or not guilty. As to Count 2, health care fraud, guilty or not guilty. As to Count 3, health care fraud, guilty or not guilty. As to Count 4, health care fraud, guilty or not guilty.

So say we all; signed and dated by the foreperson.

So, once you have all agreed on the jury verdict your foreperson must fill in the form, date it, sign it and advise the court security officer that you have reached a verdict; and you will then return to the courtroom.

Now, if you wish to communicate with me at any time, you will of course have paper to write down your message or your question, and you will give it to the Court security officer who will give it to me.

I will respond as promptly as possible, either by writing you back a note or bringing you back in here and discussing the matter with you.

I caution you however with regard to any message or question you might send that you should not tell me how many jurors have voted one way or the other at any time in any note or communication.

Ladies and gentlemen, those are my instructions to you on the law. I will now turn to the parties for the presentation of

1    their closing arguments.

2         And if you would please give them the same close and

3    careful attention as you have throughout the trial as each

4    party comes before you to present you with their closing

5    argument.

6         On behalf of the United States, Mr. Clark.

7         MR. CLARK:  Thank you, Your Honor.  Good morning, ladies

8    and gentlemen.  Before I begin; I would like to thank you for

9    how seriously you have taken your responsibilities in this

10   case.

11        You have been on time every day and paid careful

12   attention during the presentation of the evidence during the

13   trial; as well as your attentiveness to Her Honor as she was

14   reading the jury instructions.

15         So on behalf of the Government, Special Agent Butcher

16   and myself, we thank you for your participation in this case.

17   Again, you have been actively engaged in listening to the

18   testimony and looking at the exhibits that have been presented.

19        And you may not have expected when you received your

20   notice in the mail directing you to come to the courthouse for

21   jury service that you would learn so much about the health care

22   system and how health care fraud is committed.

23        You heard, ladies and gentlemen, about the role of this

24   defendant and his accomplices and co-conspirators in this case

25   and how it was they were able to successfully defraud a health

care benefits program, in this case Blue Cross Blue Shield, as well as the employers who funded the health care plan.

And so once you have heard the closing argument in this case you are going to become even more active participants. You will then -- as the Judge has told you -- become the judges of the facts.

And you are going to apply the law the Judge just read to you. And even though the law is dry, and perhaps may be boring, it is the law that must be applied in this case.

And it is the law that you must apply in determining whether or not Francel Rodriguez conspired to commit health care fraud and wire fraud and committed individual acts of substantive health care fraud.

The Judge has read you the jury instructions with respect to the conspiracy. I think it will be useful to go through the jury instructions as far as conspiracy and the law concerning wire fraud and health care fraud

And the conspiracy law I believe has been amply demonstrated throughout the case. This is not like a robbery where you have a person that takes a lady's purse on a street corner. Not even like a bank robbery with a stickup man and the getaway driver.

This was an intricate offense that had a lot of moving parts and participants in order to successfully defraud a health care program.

1    You heard the testimony this all began with employees.
2  And the individuals who worked for good employers who afforded
3  their employees good health care benefits through private
4  insurance.   In this case most of the employees have a health
5  care plan with PepsiCo that was administered by Blue Cross Blue
6  Shield.
7    These Blue Cross Blue Shield plans were administered in
8  different states; different states of the country.   They were
9  being paid to provide their information to their recruit -- to
10  their provider who was going to sell the information to
11  companies like Salvus and Blue Diamond and the 25 or so other
12  companies that Billing USA had used in order to assist the
13  clinic owners to defraud Blue Cross Blue Shield.
14    And they were paid their piece of money.    And the
15  recruiters who turned their patient information over to the
16  likes of Clara Salazar and Olga Alvarado and Roberto Perez and
17  Miguel Gonzalez they received their fee, their profit in this
18  whole scheme.
19    And then the clinic owners established the clinics under
20  their own name or another individual's name so as not to draw
21  attention to themselves.
22    They had to file their articles of incorporation become
23  registered and enrolled with Blue Cross Blue Shield to open
24  bank accounts   once they gained the enrollment credentialing
25  process with Blue Cross Blue Shield.

1    And then the business that made this whole thing roll was

2  Billing USA.  Without Billing USA's expertise none of the fraud

3  would have been committed.

4    Because these clinic owners did not have the expertise to

5  maximize the pay out to Blue Cross Blue Shield.  They required

6  someone like Mauricio Palma, Billing USA in order to provide

7  the knowledge and wherewithal as to what codes would pay out

8  maximum amounts of money without drawing the attention of the

9  insurance companies.

10    And Mauricio Palma could not do this by himself. He was

11  doing this on behalf of numerous clinics and unscrupulous

12  individuals that had no connection with health care at all.

13    They did not have licenses.  They were not nurses or

14  doctors or pharmacists or anyone dispensing legitimate medical

15  services and treatment.

16    These were just people that decided that they would

17  exploit our health care benefit system in this country.

18    And for a fee ranging from six percent to ten percent of

19  profits that had been returned by the insurance companies they

20  went to Mauricio Palma.

21    And Mauricio Palma relied on his trusted employees, his

22  right-hand man Francel Rodriguez as well as persons that

23  Francel Rodriguez oversaw and directed and managed; Sergio

24  Carratala.  Rafael Izquierdo.  And all of these participants

25  beginning with those employees at PepsiCo and culminating in

10:13  1  the likes of Francel Rodriguez allowed this crime to unfold.

10:13  2  It is this type of crime that the conspiracy law addresses;

03:28  3  recognizing it requires more than one individual to

03:28  4  successfully complete a crime such as the one you have seen

03:28  5  this past week.

10:13  6      As the Judge told you a conspiracy is not a formal

10:13  7  agreement, it is not a business contract like the providers

10:13  8  obtain from Blue Cross Blue Shield where they wrote on the

10:14  9  dotted line that I hereby agree to follow the rules and submit

10:14  10  to you lawful and honest claims based upon treatments that were

10:14  11  given to people that had medical necessity for treatment and

10:14  12  physical therapy.

10:14  13      That is not what is required under the conspiracy law.

10:14  14  It is merely an informal agreement or understanding between two

10:14  15  or more persons to commit a crime.

10:14  16      In this case the crimes are wire fraud and health care

10:14  17  fraud.  And the defendant could be "Mr. Big" that orchestrated

10:14  18  the whole event or it could be the persons that sold their

10:14  19  information.

10:14  20      They are all members of the conspiracy and so each

10:14  21  conspirator is responsible for the actions of the other

03:30  22  conspirators; recognizing it takes more than one person in

03:30  23  order to make a crime like this fraud work.

10:15  24      Under the law they are all treated as partners; if a

10:15  25  defendant knowingly and intentionally joined in that agreement

10:15  1    on one occasion. The other laws that you need to consider are

10:15  2    wire fraud and health care fraud because those are the two

10:15  3    crimes at play here.  As the Judge mentioned to you wire fraud

10:15  4    requires four things to be proven.

10:15  5        You will not have to make a formal decision whether or

10:15  6    not the defendant committed wire fraud.  He is only charged

03:30  7    with health care fraud as substantive counts.  But wire fraud

10:15  8    and health care fraud are similar because they are just

10:16  9    different ways of saying schemes involved to take money away

10:16  10   from somebody by intentional misrepresentation.  Wire fraud

10:16  11   requires that a defendant knowingly devised or participated in

10:16  12   a scheme to defraud so as to obtain money or property by using

10:16  13   false pretenses, representations or promises and that the false

10:16  14   pretenses representations or promises were about a material

10:16  15   fact.

10:16  16       The defendant acted with the intent to defraud and the

10:16  17   defendant transmitted or caused to be transmitted by wire some

10:16  18   communication in Interstate Commerce to help carry out the

10:16  19   scheme to defraud.

10:16  20       Obviously, ladies and gentlemen, there is nothing but

10:16  21   fraud involved with Billing USA.  They provided no services to

10:16  22   legitimate customers whatsoever; everything was fraudulent.

10:16  23       All these submissions for physical therapy, injections of

10:17  24   vitamins and steroids or muscle relaxers; there were no

10:17  25   patients that ever required any of these services, nor were

administered any of these services. The whole goal of this plan was to submit these bills to Blue Cross Blue Shield in order to collect money

Recognizing that Blue Cross Blue Shield did not have the wherewithal to go and look behind every individual of the millions of claims processed on a regular basis to determine if this one claim on behalf of a four month old girl was actually legitimate

Or whether these 35 injections on a particular day three times a week times four were actually administered to one of the many patients that were being billed on behalf of Salvus.

So they relied on the fact that Blue Cross Blue Shield if the criteria are met, if that super bill had a legitimate insured person's name on the paperwork that they had the right diagnostic code that they had the right code for physical therapy or injections and that it was filed or reviewed and passed the audit system that was employed by Blue Cross Blue Shield

And money would flow back, and that money would go to the clinic owners and Billing USA and the defendant and the employees would all get their cut of the action which was understood by their participation in this scheme.

Obviously false representations were integral to this scheme.  Every one of those claims submitted by the defendant and other people working at the direction of Mauricio Palma

10:19  1    were all false.  The defendant acted with the intent to defraud

10:19  2    and the defendant transmitted or caused to be transmitted by

10:19  3    wire some communication in Interstate Commerce.

10:19  4         Each of those computer data entries that were forwarded

10:19  5    to Blue Cross Blue Shield were wire communications in

10:19  6    Interstate Commerce.

10:19  7         You heard testimony that the defendant did it himself, he

10:19  8    was doing data entry as well as directing other employees to

10:19  9    transmit wire communications, in this case super bills, that he

10:19  10   would assign work every morning to Sergio to Rafael -- it was

10:19  11   the defendant who gave them their daily work assignments.

10:19  12        The Judge has already told you that a statement is false

10:20  13   and fraudulent if it is about a material fact.  Obviously with

10:20  14   the hundreds of thousands and millions of dollars of claims

10:20  15   being submitted on behalf of Salvus -- which was just one

10:20  16   example of the many other clinics where similar acts were being

10:20  17   performed and were certainly untrue.

10:20  18        And the individuals such as the defendant who worked at

10:20  19   Billing USA certainly knew they were false or had a reckless

10:20  20   indifference as to whether this was legitimate or not.

10:20  21        The statement may be false and fraudulent when it is a

10:20  22   half truth or effectively conceals a material fact and made

10:20  23   with the intent to defraud.

10:20  24        As I mentioned wire fraud and health care fraud are very

10:20  25   similar, and you will be called upon to determine whether the

defendant is guilty of individual counts of health care fraud as alleged in the indictment; that is Counts 2 through 4.

These counts are that the defendant knowingly executed a scheme or artifice to defraud a Healthcare Benefit program by means of false pretenses representations or promises, the health care and wire fraud benefit affected Interstate Commerce, the false pretenses representations or promises related to a material fact.

The defendant acted willfully and intended to defraud and the defendant did so in connection with the delivery of payment for health care benefits items or services.

As the Government instructed you Blue Cross Blue Shield of Florida is a Healthcare Benefit program.

Just like we heard with respect to the wire fraud and health care fraud; a statement is false or fraudulent if it is a material fact that the speaker knows is untrue or makes with reckless indifference as to the truth and makes with intent to defraud.

That instruction includes the fact that intent to defraud means to do something with the specific intent to deceive or cheat someone usually for personal financial gain or to cause financial loss to someone else.

There is no way to justify the illegal nature of the billing that took place by Salvus, performed by Billing USA.

30

During opening statement Ms. Lomax said to you that defense does not challenge the fact that fraud was afoot here.

Certainly Clara Salazarar Vust when she came here and told you she did not purchase any of the drugs, provide any injections, provide any of the treatments that were billed; it is un-contested.

And the blatancy of the fraud that took place was cemented by the testimony of the Government's last witness Ms. Martin who told you a cursory review of the billing data showed how outrageous the billing was.

It really bore no medical semblance to reality; because you cannot treat people with the amounts and the dosages and the frequency of applications as demonstrated here.

And so these clinics, even though they represented themselves to be medical clinics, never saw different people with a cross section of different insurance or Medicare and Medicaid come in with common complaints that you would see in a medical clinic; and they are all the same.

They followed the same pattern which was excessive and unnecessary and outrageous.

Instead, what the defense challenges is whether or not the defendant acted intentionally and with knowledge.

Now, the Government cannot submit an exhibit which contains the intent of his mind; say look at his brain and say this was the defendant's intent or knowledge.

10:24  1      It is up to you to determine from the facts and

10:24  2  circumstances and testimony and the exhibits introduced during

10:24  3  the course of the case and applying your commonsense and

10:24  4  experience to determine if, in fact, the defendant knew what he

10:24  5  was doing was a fraud.

10:24  6      I submit to you, ladies and gentlemen, that has been

10:24  7  demonstrated over and over again by the number of witnesses who

10:24  8  testified who had first-hand knowledge of dealings with the

10:25  9  defendant as well as just the surrounding facts that anyone in

10:25  10 those circumstances would know at some point in time sooner

10:25  11 than later that there was fraud afoot

10:25  12     And they were directly involved in it if they are a high

10:25  13 level employee a trusted person that worked at Billing USA for

10:25  14 three years who occupied the role that the defendant did who

10:25  15 was the right-hand man, whose office was right next to Mauricio

10:25  16 Palma.

10:25  17     He acted for Mauricio Palma during Mauricio Palma's

10:25  18 frequent absences.  Who supervised other persons who came into

10:25  19 this Court like Sergio Carratala, who is charged in this

10:25  20 indictment, and Rafael Izquierdo who were taking directions

10:25  21 from the defendant.

10:25  22     Who admitted that they knew they were committing fraud

10:25  23 having a lesser position than the defendant and having worked

10:25  24 for Billing USA for a shorter period of time than the defendant

10:26  25 did.

You heard from Mr. Palma who told you he hired the defendant specifically for the position of office manager that the defendant began working with Mauricio Palma at the inception of Billing USA when Mr. Palma operated it from his home and clients like Olga and Roberto would come to the house and Mauricio Palma would do the billing on their behalf.

And as Mauricio Palma grew his business, he started his business in the office on south 27th Avenue and Eighth Street and he hired other employees, Rafael Izquierdo was hired and came with him.

Sergio Carratala was hired by the defendant to work there as well as the other individuals whose names you heard.  And Mauricio Palma once he had additional business and perfected his method of maximizing the amount of profits from Blue Cross Blue Shield adopted the two tiered system the six percent and ten percent.

You all know what that six percent and ten percent represent.  That is the fee that Billing USA assessed each of the clinic owners based on the money that was reimbursed by Blue Cross Blue Shield to the corporate accounts of the individual clinic owners as Mauricio Palma stated as Sergio Carratala stated as Miguel Gonzalez stated that it was the practice when a new client came to Billing USA, Mauricio Palma would meet with that new client -- again these are not legitimate people who are doctors and nurses and business

1   people who had a sincere interest in operating a clinic to help

2   people.

3        No, these people you heard about here at trial were just

4   people who came in off the street, as it were, who came to

5   Billing USA and met with Mauricio Palma and their intent was to

6   commit a crime.  It was not to find the best billing company

7   around or to find the most honest one.

8        It was the opposite, the one who was the most skilled at

9   illegal activities, and Mauricio Palma was quite skilled in

10  dealing with these new clinic owners.

11       For six percent you give us the super bills and we will

12  process them and for ten percent we will create the super

13  bills; we being Billing USA, we being Mauricio Palma, we being

14  Francel Rodriguez or Sergio Carratala.

15       And to justify the additional fee, you heard Sergio

16  Carratala state it is because of the added exposure because

17  there was no pretence of legitimacy.

18       If you are creating bills saying this particular patient

19  received three sessions of physical therapy on this week and

20  received three injections the same day of the same week three

21  times a week and have done so not only this week, but the

22  preceding week and the week before that and as far back as the

23  individual clinic owners were willing to risk it, two months,

24  three months, we will absorb that risk for a ten percent

25  percentage.

To some of the clinic owners like Olga Alvorado, Roberto Perez and Miguel Gonzalez that was a good option, that was a good return on the dollar.  It justified paying the extra money.

They knew the best way to bill and how to manipulate the system and in turn to maximize the amount of money that the clinic owners would get and so line the pockets of Billing USA. Each of those individuals said that Mauricio Palma would explain that in the same terms I just described to you to each of the clinic owners and that on occasion the defendant would participate in those meetings.  Miguel Gonzalez stated that, Sergio Carratala who likewise was invited in with new clients in order to listen to the pitch.

There are further facts that indicate the defendant knew. He himself prepared fake super bills.  He himself would take the template that Mauricio Palma kept in his office depending on whether it was a male or female patient, the given age of the patient.

And Francel Rodriguez would do it, Sergio Carratala would do it, Mauricio Palma if he happened to be in the office and not on vacation would do it.

They would refer one, two or three patients on a given day, start arbitrarily writing the information on the top; that this is Blue Cross Blue Shield, that this is this patient and on these dates this is what happened.

They would take the calendar and once it was determined by the defendant as to whether or not a patient was eligible for coverage and how much coverage they had and once the clinic owner was contacted by the defendant to verify how long they wanted to predate the billing back.

They wanted to do the information in order to put that super bill in the bin and have one of the other data processors transmit that information to Blue Cross Blue Shield.  The defendant was the person in charge of bookkeeping of accounting.  In addition to that, he had adapted the software system for Mauricio Palma.  He installed the separate billing entities.

There was one Office Ally account for Billing USA and then there was the extra secret account for Billing Data.

If you recall from the testimony Billing USA was normally responsible for the six percent and Billing Data was more responsible for the ten percent.

 And there was an extra step to take to conceal the fact that Billing Data was billing under Billing USA.  It was the defendant who created that system.  It was the defendant who was responsible to use that system because he was the bookkeeper.  He was the accountant.  He was the one responsible for preparing all the invoices to the clinic owners and he had to keep track for Mauricio Palma which clinic owed six percent and which clinic owed ten percent.

10:33  1    You will recall that the individual files reflected ten

10:33  2  percent or six percent and that many of the ten percent clients

10:33  3  paid in cash.  All of this corroborates the fact that the

10:33  4  defendant knew and had every reason to know and intentionally

10:33  5  committed the fraud for which he was charged.

10:34  6    The Judge will tell you similar to the conspiracy law as

10:34  7  far as the substantive counts that he is charged as an aider

10:34  8  and abetter.   And you saw the three counts that were broken

10:34  9  out from the thousands of claims submitted on behalf of the

10:34  10  individual patients.

10:34  11    You saw the patient folders pertaining to two of those

10:34  12  three patients; Raul Rojas and Sheindader Telfort.

10:34  13    Clara Salazarar Vust said that all of her claims were

10:34  14  false; and those files she corroborated were hers.

10:34  15    And you will recall within one of those files of another

07:05  16  individual that it had defendant's own fax cover sheet in which

10:34  17  the defendant took super bills that presumably he created and

10:34  18  had billed three months preceding; back-dating all of these

10:34  19  claims.

10:34  20    Submitted all the claims at once just like Elizabeth

10:35  21  Martin corroborated not daily as the treatment was being done.

10:35  22  But going back three months in order to maximize the payouts.

10:35  23  And the defendant faxed the super bills to Salvus.

10:35  24    That, ladies and gentlemen, if you are in need of any

10:35  25  smoking gun, any absolute evidence of the defendant's guilt

lies right in those patient files.  That the super bills are supposed to be provided to Billing USA.  And in this case none other than Francel Rodriguez is sending the super bills to the clinic owners to let them know what is being billed.

Those three counts, ladies and gentlemen, the defendant is responsible because he is an aider and abetter because of his role in assisting Mauricio Palma.

Because of his role as office manager where he worked in concert with the other individuals and where he knowingly participated in Count 1 at Billing USA and on behalf of Clara Vust to submit those false invoices.

So on those three counts he is charged as an aider and abetter; he is responsible for the behavior of his fellow employees with whom he was acting in concert; similar to the conspiracy law.

The Judge has read to you the jury instruction concerning knowledge which provides you with additional guidance in determining whether the defendant had the requisite knowledge and intent to commit the crimes alleged in the indictment.

And Judge Williams read to you that when knowledge of the existence of a particular fact that is an essential part of an offense such evidence may be established if the defendant is aware of a high probability of its existence; unless the defendant actually believes it does not exist.

And she continued; in other words, you may find that the

10:37  1    defendant acted knowingly.  If you find beyond a reasonable

10:37  2    doubt either that the defendant actually participated in a

10:37  3    scheme or artifice to defraud a Healthcare Benefit program or

10:37  4    that he deliberately closed his eyes to what he had every

10:37  5    reason to believe was the fact.

10:37  6         Members of the jury, you have the facts that any

10:37  7    reasonable individual working three years at the right hand of

10:37  8    Mauricio Palma engaged in this high level fraud and certainly

10:37  9    acted knowingly, willfully and intentionally.

10:37  10        Thank you.

10:37  11        THE COURT:  All right.  Ladies and gentlemen, we will

10:37  12   take our first break of the morning.  You have not heard all of

10:37  13   the closing arguments; and therefore I will instruct you not to

10:38  14   talk to each other about the case.

10:38  15        Have some coffee and juice and we will be back in

10:38  16   about five minutes.

10:38  17        COURT SECURITY OFFICER:  All rise, please.

10:38  18                      RECESS TAKEN

10:46  19        THE COURT:  All right.  Bring in the jury, please.

10:46  20        COURT SECURITY OFFICER:  All rise, please.

10:46  21        THE COURT:  Everyone may be seated.

10:47  22        MR. DUNHAM:  Thank you, Your Honor.

10:47  23        Francel Rodriguez is not guilty.  He did not know

10:47  24   there was a fraud being committed, even from jail Mauricio

10:48  25   Palma is calling the shots.

10:48  1          Mauricio Palma is dictating to the Government who to

10:48  2   charge even from jail.   The evidence in this case the

10:48  3   Government brought to you consisted of a hundred percent of

10:48  4   co-conspirators.

10:48  5          They did not bring one document of evidence to prove

10:48  6   that Francel Rodriguez knew what was going on.   I want to talk

10:48  7   to you about many things; I have a lot of notes.

10:48  8          I want to talk to you about knowledge first.

10:48  9   Obviously Francel did not know what was going on.   I want to

10:48  10  talk about all the different things you heard that show he did

10:49  11  not have knowledge.

10:49  12         I want to talk to you about the credibility of these

10:49  13  witnesses and I want to talk to you about the lack of evidence

10:49  14  in this case.

10:49  15         There is a lot of lack of evidence.   Why is that

10:49  16  important?   That's important because if Mr. Rodriguez knew what

10:49  17  was going on and was actively involved in a fraud they would

10:49  18  bring something -- anything besides seven people who have been

10:49  19  convicted, seven admitted fraudsters.

10:49  20         So let's go through the evidence; because the

10:50  21  Government can't have it both ways.   Either everyone knew that

10:50  22  there was a fraud or some people knew there was a fraud and

10:50  23  some people didn't.   They can't have it both ways.

10:50  24         Mr. Rodriguez is in this group.   We have Rudy Andreu,

10:50  25  he worked there, did super bills, not arrested.

```
10:51   1          Calixto Telleria worked at Billing USA, admittedly he
10:51   2   took the bills home.  The evidence is he would pick up the
10:51   3   bills and take them home.  He was not arrested.
10:51   4          Betsy Navarro, the secretary worked there and knew
10:51   5   Mauricio Palma for years, even before Billing USA, the
10:51   6   secretary actively involved did billing.
10:51   7          Sergio told you Betsy did billing.  She also was not
10:51   8   arrested, not charged.
10:51   9          Kathy Montenegro, Guadalupe Montenegro -- Mauricio's
10:51  10   family, his niece and sister worked there.  The evidence was at
10:51  11   one point Guadalupe Montenegro was a manager.
10:52  12          The Government says he was the manager so he must be
10:52  13   guilty; but Guadalupe Montenegro was also a manager.
10:52  14          You mean to tell me his own sister does not know he is
10:52  15   committing all this fraud?
10:52  16          The Government may tell you these other people Ruddy,
10:52  17   and Calixto they are not on trial, and that's true; but this is
10:52  18   highly relevant that these people worked there and did super
10:52  19   bills and have not been arrested, have not been charged.
10:52  20          So they are not on trial and they don't have to prove
10:52  21   evidence against Ruddy or Calixto; but it is important to know.
10:52  22   Because this all goes to knowledge, right?
10:52  23          These people didn't know; so why did Francel Rodriguez
10:53  24   know?  These people didn't know and were not arrested or
10:53  25   charged; so they can't have it both ways.
```

10:53  1          So everyone knew -- Mauricio Palma told you 94 percent

10:53  2    was fraud -- so either everyone knew about the 94 percent fraud

10:53  3    and was in on it and so should be arrested or charged at some

10:53  4    point or not.

10:53  5          It is an issue about knowledge and whether Francel

10:53  6    Rodriguez should have known or knew.  Let's talk about the

10:53  7    businesses.  Mary Tejada spoke with you about her investigation

10:53  8    of Salvus.

10:53  9          What did she say about Salvus?  She said she went

10:53  10   looking for Salvus, couldn't find it, the business moved; it

10:54  11   was in a residential neighborhood and it was supposed to be a

10:54  12   clinic.

10:54  13         She kept calling and could not get through on the

10:54  14   phone.  That is Salvus.  Anyone who works at Salvus knows it is

10:54  15   a fraud.

10:54  16         What about Billing USA?  There are uniforms, and

10:54  17   office, the Billing USA sign on 27th Avenue; there is a big

10:54  18   sign that says Billing USA.

10:54  19         So you have uniforms, computers; all the appearances

10:54  20   that this is a legitimate business.  That is something to think

10:54  21   about when you are wondering whether the Government has proven

10:54  22   to you that he really knew this was a fraud.

10:55  23         What about this?  Remember Olga Alvorado -- this

10:55  24   involved Olga Alvorado and Sergio Carratala.  Olga Alvorado

10:55  25   specifically told you she sat down face-to-face -- I was clear

10:55  1    on cross examination I asked her -- you sat down face-to-face

10:55  2    with Mauricio Palma and he explained to you how he did the

10:55  3    fraud and how to do the fraud.

10:55  4           You have not heard anyone, all these cooperators, you

10:55  5    never heard anyone -- specifically Mauricio Palma -- come in

10:55  6    and say I sat down face-to-face with Francel and told him how

10:55  7    to do the fraud.

10:55  8           And then Sergio yesterday corroborated that.  The

10:55  9    Government asked, did you ever overhear Mauricio explain the

10:56  10   fraud to Francel?

10:56  11          He said no.  He said no.  So don't you think there

10:56  12   would be some direct evidence that he knew?

10:56  13          Hey, I told him this or that; we were doing all this

10:56  14   crazy stuff.  Don't you think someone would come in and say

10:56  15   they told him that if they really told him that?

10:56  16          Seven witnesses came in and no one said they had that

10:56  17   specific conversation with him.  Knowledge.  What is another

10:56  18   issue of knowledge?

10:56  19          What about the fact that all the evidence of those

10:56  20   people -- every single one of them was involved in another

10:57  21   clinic or another billing company doing other fraud either

10:57  22   before or after.

10:57  23          Every single person, from Olga Alvorado, Roberto Perez

10:57  24   -- Sergio opened up another one afterwards.  Rafael went out on

10:57  25   his own.  Every single person was involved in more fraud.

10:57 1        Did the Government present any evidence that this

10:57 2   gentleman was doing any other fraud?  Why is that important?

10:57 3   It goes to his knowledge.

10:57 4        If they proved that he was involved with five

10:57 5   fraudulent companies then he knows, right?  There is so much

10:57 6   stuff that they have not shown you that if he really knew what

10:58 7   was going on they would have.

10:58 8        We are in United States District Court and this is all

10:58 9   they have.  They have seven witnesses who are in jail or about

10:58 10  to go to jail.

10:58 11       What about this in terms of the knowledge?  Sergio

10:58 12  admitted yesterday that he was caught on tape speaking to a

10:58 13  woman name Celia Dominguez Cruz, who was the owner of Blue

10:58 14  Diamond, talking about the fraud.  Did you hear any of that

10:58 15  regarding Francel?

10:58 16       What about Roberto Perez?  I have so many notes here

10:58 17  because there is so much here.  Roberto Perez told you there

10:59 18  were 24 phone calls of his recorded and one audio.  So he is on

10:59 19  tape talking about the fraud.

10:59 20       They don't have any of that for this man who is on

10:59 21  trial today.  That goes to knowledge.  It goes to people who

10:59 22  are admitting -- talking about the fraud --  who obviously know

10:59 23  there is a fraud going on.

10:59 24       They have never produced any evidence that Francel

10:59 25  knew this was a fraud except for these seven witnesses who are

10:59  1   looking at jail time or in jail now.  There is actually a jury

10:59  2   instruction -- and Her Honor read this to you.  This is the law

11:00  3   of the United States that was just read to you.

11:00  4          I will not read the whole thing, but the last sentence

11:00  5   is important.  You should consider that testimony -- in other

11:00  6   words the testimony of accomplices and co-conspirators -- with

11:00  7   more caution than the testimony of other witnesses.

11:00  8          And there is a reason for this and that is because

11:00  9   they have a motive to lie.  You should be really cautious in

11:00 10   talking about that.

11:00 11          So I want to talk about the credibility of the

11:00 12   witnesses.  And I am not necessarily going to go through every

11:00 13   single witness, but I will try to go through most of the ones

11:00 14   who testified.

11:00 15          I already said this, but it's worth repeating.  All of

11:01 16   those witnesses could have been charged with other things.  So

11:01 17   they are getting a benefit.

11:01 18          Mauricio has issues in Kentucky and New Jersey; and

11:01 19   that came out.  He has fraud going on in Kentucky and New

11:01 20   Jersey.

11:01 21          Rafael started his own second fraudulent company and

11:01 22   Billing USA.  He is not charged with both, just charged with

11:01 23   one.

11:01 24          Sergio went into business with Mauricio.  He is not

11:01 25   charged with the other company.

11:01   1         Every single person -- they all had charges dismissed

11:01   2   as a part of the plea deal.

11:01   3         Every single one got some benefit.  So, what about

11:01   4   relationships when we are talking about credibility?  What

11:01   5   about the fact that Mauricio and Francel had an affair at one

07:11   6   point?   So they have a relationship; they have a reason to get

07:11   7   their story together.  What about Mauricio and Sergio?  They

11:02   8   started a business together.  They remained friends after

07:13   9   Billing USA.  They have a reason to get their story together.

11:02  10         Rafael and Tony had a relationship.  Rafael and Tony

11:02  11   went and started a new business together.  Why is that

11:02  12   important?  You have Mauricio and Sergio who leave to start a

11:02  13   business.

11:02  14         And you have Rafael and Tony.  Who is in the middle

11:02  15   Francel Rodriguez.  He does not have a relationship with these

11:02  16   people; he is not friendly with them.

11:02  17         He does not have a prior business relationship.  He

11:02  18   does not have a business relationship with them afterwards.  He

11:02  19   is the fall guy.  He is the one they will point the finger at.

11:03  20   All seven of them -- talking about credibility -- the only one

11:03  21   of the seven that actually admitted to you the truth, that

11:03  22   admitted they are testifying to try to get a reduced sentence

11:03  23   was Sergio.  And he was the last witness; he was yesterday.

11:03  24   All the other people Mauricio, Clara Miguel, Olga Roberto they

11:03  25   all -- it was like pulling teeth because they tried to have you

11:03  1  believe that they are here just testifying out of the goodness

11:03  2  of their heart.   They did not want to admit to you that they

11:03  3  wanted a lower sentence.   They said, oh, I am fine with

11:03  4  whatever I get, the Judge will sentence me.

11:03  5          Come on; do you believe that?   I had to ask them; you

11:04  6  have high priced lawyers, you have excellent defense lawyers,

11:04  7  these lawyers told you about 5K's.

11:04  8          And I know this is legal stuff where you think I am

11:04  9  throwing out words and numbers; but it came out in the

11:04  10  evidence.

11:04  11          I had to cross examine them and ask them, you mean to

11:04  12  tell me your lawyer did not tell you about a 5K1 motion?

11:04  13          Oh, yeah, of course I heard about that.   You mean to

11:04  14  tell me your lawyer did not tell you about a reduction in your

11:04  15  sentence based on your cooperation?   Oh, right, I'm sorry; I

11:04  16  forgot that.

11:04  17          They all wanted you to believe that they were just

11:04  18  here to testify and not trying to get any benefit.   That is not

11:05  19  believable.

11:05  20          Take a look at this instruction.   A witness who hopes

11:05  21  to gain more favorable treatment in his or her own case.

11:05  22  That's all there.   They wanted you to believe that is not the

11:05  23  case.

11:05  24          Let's go through one by one a little bit.   There's so

11:05  25  much here; I just hope you go back and think to yourselves

about the things that were not believable. So Mauricio -- this
is important -- he was up there for an hour.  He is the
mastermind, he is the leader.  He is up there over an hour
testifying.

     He never once says that Tony -- this mysterious tall
Tony character in the picture -- never once said that Tony did
super bills until we cross examined him.

     Then Mauricio -- didn't he try to seem like this all
started out legitimate?  He tried to make it seem like I
learned how to bill and this was just like normal billing.

     Olga told you he specifically taught her how to do all
of this stuff.  After we cross examined then the Government got
back up there and said basically, isn't it true you did this
from the start?

     His quote was honestly, yes.  And when someone says
honestly, yes, that means all of a sudden they are being
honest.  It means like earlier they were not being honest.

     He did finally admit that it was a fraud from the
beginning.  Why is it so hard to pull this stuff out of these
witnesses?  Because they are not telling the truth.

     Mauricio made it seem like only Francel Rodriguez had
the keys to the office.  Sergio said everybody had the keys.
Unbelievable.

     Also at some point they asked who the woman was in the
photograph and he said I think, another quote, the secretary.

11:07  1   I think the secretary.  Then on cross examination he knew her

11:07  2   even before Billing USA.  So he is trying to maximize Betsy.

11:08  3   Here's another thing as to credibility with Mauricio Palma --

11:08  4   it goes to the heart of the case -- we heard a lot of these

11:08  5   super bills.

11:08  6        So in trial, I think Monday or Tuesday when Mauricio

11:08  7   testified, in trial he said that Sergio, Rafael and Francel did

11:08  8   the super bills.  That's what he said in trial, right?

11:08  9        And then we cross examined him and he admitted to

11:08  10  telling the FBI agents -- by the way we know it is a crime to

11:08  11  lie to a FBI agent -- he admits to telling FBI agents that

11:08  12  Sergio, Rafael and Tony did the super bills.

11:08  13       So when Francel Rodriguez is in trial for his life all

11:09  14  of a sudden he says, oh, yeah Francel is doing super bills.

11:09  15       Previously in speaking with the agents it is Tony

11:09  16  doing super bills.  That is a huge inconsistency with his

11:09  17  credibility.

11:09  18       I apologize I have to find my stuff; there's so much.

11:09  19       Let's talk about Sergio.  This was another incredible

11:09  20  moment where he did not remember the name of Ms. Navarro.  He

11:09  21  had, had an intimate sexual relationship with her and he only

11:09  22  admitted to knowing her after we brought that up.

11:10  23       Didn't you have sex with her?  And then oh, yeah

11:10  24  that's Betsy Navarro.  So while these may seem like small

11:10  25  things this really goes to a fundamental issue of credibility.

11:10  1

11:10  2          It is different if the Government brought you all this

11:10  3  other evidence to show that Mr. Rodriguez committed this fraud,

11:10  4  but they had to bring you in all these people -- such as

11:10  5  Mauricio and Sergio -- and they all lie.

11:10  6          And if you are willing to lie about something so

11:10  7  simple then you are willing to lie about everything.

11:10  8          And let's go to Rafael, who I believe is also in the

11:10  9  picture here too.  It get better with every witness.  I wish I

11:10  10  could stay up here forever, but I can't.

11:11  11          Rafael came in and had the nerve to tell you he left

11:11  12  Billing USA out of some moral objection.  He said he had a

11:11  13  moral objection to what was going on at Billing USA so he left.

11:11  14          That alone you may say, okay, if he found out there

11:11  15  was a bad fraud he should have a moral objection to it because

11:11  16  it was fraud.

11:11  17          But then he coupled that by saying he left to do the

11:11  18  fraud better.  He left to form his own company to do it better

11:11  19  and to do more fraud.

11:11  20          And then he lied to you about the super bills.  He

11:12  21  lied about the crux of the matter.  He came in here, Rafael,

11:12  22  and said he never did super bills.

11:12  23          Then my colleague Ms. Lomax said, let me get this

11:12  24  Grand Jury transcript out, and showed him that you were in

11:12  25  front of the Grand Jury where you have to take an oath and you

11:12  1    admitted in the Grand Jury you did do super bills. Rafael is

11:12  2    not credible.   How about Olga Alvarado?   Again, Olga Alvorado

11:12  3    on direct examination when the Government asked her questions

11:12  4    -- they kept talking over and over about Francel, Sergio and

11:13  5    Mauricio doing super bills.

11:13  6            Only on cross examination did she say Tony, Rafael,

11:13  7    Betsy, Rudy everybody else.   Then -- and this is 100 percent

11:13  8    accurate -- Olga never said she gave any money directly to

11:13  9    Francel Rodriguez.

11:13  10           All she said is she gave bonuses to everyone.   That

11:13  11   directly contradicts Roberto.   Roberto said Olga gave Francel

11:13  12   money.   Olga was also involved in fraud previously at the

11:13  13   Murado clinic.

11:13  14           She's not credible that's a major conflict.   You mean

11:14  15   you don't remember giving $6,000 to someone.   Interestingly he

11:14  16   said he could not remember if it was cash or a check.   Roberto

11:14  17   Perez, he is not credible.

11:14  18           I have spoken about most of the witnesses and why

11:14  19   they are not credible and why you can't believe them.   That

11:14  20   coupled with the jury instruction that tells you, you have to

11:14  21   be more cautious with them, as well as the lack of evidence in

07:15  22   this case, which we will get to next.

11:14  23           All right.   Let's talk about the credibility of this

11:14  24   investigation.   Isn't it weird that Special Agent Butcher did

11:14  25   not know the name of Sergio's sister and niece and the fact

1    that they worked there.   Why is that important?   Remember

2    Special Agent Butcher also told you that the specific

3    investigation of Francel Rodriguez started after Mauricio Palma

4    got arrested.

5         So logically -- Mauricio Palma is arrested so he

6    starts telling the Government who to arrest and that Francel is

7    involved.

8         So it is either that Mauricio did not tell Special

9    Agent Butcher that my sister and niece were involved or Special

10   Agent Butcher did not ask or he did not investigate.

11        So there are issues with the investigation beside just

12   the witnesses.   And they are relying on co-conspirators who

13   have a motive to lie.

14        So, where are all of these people at?   It shows the

15   Government and the agent is taking Mauricio's word for it.   How

16   does the witness not know that these people were involved?

17        And Kathy Montenegro, Guadalupe Montenegro -- the

18   agent did not even know the names so you know they have not

19   been arrested either in this investigation.

20        And Special Agent Butcher got up and told you, oh,

21   Betsy Navarro was just a secretary; she didn't do billing.   But

22   that's not what their own witnesses said.

23        Sergio said she did billing.   Everybody there did

24   billing; it is a small office.   So now we have the credibility

25   of witnesses and the credibility of the investigation.

11:17  1          Now I want to talk to you about a lack of evidence.

11:17  2    That is important because in a court of law they have to bring

11:17  3    you the evidence.

11:17  4          They brought you witnesses.  They have not brought you

11:17  5    the things to show that my client is guilty.

11:17  6           I want to talk to you about the patient files.  The

11:17  7    Government brought up the patient files.  If there is a smoking

11:17  8    gun the smoking gun is you see Francel faxed something back to

11:18  9    Salvus.

11:18  10          There is no evidence at all that Francel was the one

11:18  11   that actually did that super bill.  There actually isn't --

11:18  12   there is no evidence who prepared that actual super bill.

11:18  13          There is no handwriting expert, there is no witness to

11:18  14   say Francel before he faxed it filled it out; none of that.

11:18  15   You don't have any of that.

11:18  16          The Government told you he prepared super bills but no

11:18  17   one came in and said they saw Francel prepare a super bill.

11:18  18   All we have is this fax that he sent.

11:18  19          We know all these other individuals, Rudy Andreu,

10:51  20   Betsy, Calixto, Kathy Montenegro, Guadalupe Montenegro we know

11:19  21   they sent bills back to Salvus and back to people too.

11:19  22          Why is my client any different than them?

11:19  23          The Government has of course proved that there was

11:19  24   health care fraud committed; it just was not committed by

07:29  25   Francel Rodriguez.  He did not know what was going on.

You are probably thinking because of the way the prosecutor talked about it -- I mean of course it is a scourge on our community.

But in this case they have to prove that my client is guilty not just that health care fraud happens in South Florida; because of course they have proven that.

There are clinics and billing data places and all of this different illegal stuff going on here.  And that they have a hundred percent proven; but they have not proven that my client is guilty.

They told you that the amount of billing -- which is so ridiculous that anybody would know.  Well, Ms. Martin, who has been a nurse for 15 years  of course could easily identify something that is fraudulent.

There is no evidence at all that my client went to medical school or had any background in medicine or my client worked at a pharmacy or anything like that.

He worked at an airport before this.  That's what we know.  There is no evidence that he should have known himself. He was not involved in the medical field before this.

So now I want to get into the crux of the lack of evidence.  I have my list as to the lack of evidence.  Right off the bat there was no evidence that my client fled or tried to somehow get away.  He has been here every day.  He entered a plea of not guilty.

11:21   1          Let's talk about the case.  And this goes back to the

11:21   2    investigation and credibility of the investigation.

11:21   3          We have Special Agent Butcher and his team and every

11:21   4    day we have seen his team; they are here.  There are agents and

11:21   5    the Prosecutor's Office.

11:21   6          They have resources.  You heard Special Agent Butcher

11:22   7    say he can subpoena bank records, e-mails, cell phone records.

11:22   8    There are no bank records to show that my client got rich off

11:22   9    of this.

11:22  10          Let's get down to the crux of it.  Where is the money?

11:22  11    There are no text messages between my client and Calixto and

11:22  12    Sergio and Mauricio saying, hey, is this a 10 percent, is this

07:33  13    a six percent, is this a super bill.

11:22  14          This is the United States Government; they have access

11:22  15    to all of that stuff.  They can order it, they can subpoena it.

11:22  16    They can investigate the case.

11:22  17          There are no e-mails.  We are in 2018 on a Federal

11:22  18    fraud trial and they have not brought one e-mail or text to

11:23  19    show my client knew what was going on.

11:23  20          Why?  Because he didn't know there are no phone

11:23  21    recordings.  We know that is possible because they have Roberto

11:23  22    Perez on his recorded call with a confidential informant.

11:23  23          They don't have it here.  No audio or video tapes.  We

11:23  24    know that is possible from Sergio Carratala.  These are all

11:23  25    reasons that you can find a reasonable doubt.

11:23  1          There is no money trail.  Before I talk about the

11:23  2     money trail I want to explain to you about the law of

11:23  3     reasonable doubt.  The Judge read you the instruction.

11:24  4          I am going to give you a little example of how you can

11:24  5     kind of understand what a reasonable doubt may mean.  This is

11:24  6     not about the case; it's just an example of a reasonable doubt.

11:24  7          Let's say that I have a box and I put the mouse into

11:24  8     the box and there is a lid -- this box has no holes in it -- it

11:24  9     has nothing, it's just a box.

11:24  10          You put the mouse in the box, then you put a cat in

11:24  11     the box and you close the lid.  You can't get out of the box.

11:24  12     You put the cat inside of it, you leave for five minutes, you

11:24  13     come back and the mouse is gone.

11:24  14          What happened?  The cat ate the mouse.  We know that

11:24  15     hundred percent.

11:24  16          Situation number two; same box, same cat, the cat is

11:25  17     hungry.  Different mouse, first mouse got eaten.  Before you

11:25  18     put the mouse in you drill a hole in the bottom of the box and

11:25  19     you put the mouse back in and the cat back in and close it.

11:25  20          You come back five minutes later and what happened?

11:25  21     You come back and the mouse is gone; and so this time what

11:25  22     happened?

11:25  23          It could be two things; either the cat could have

11:25  24     eaten the mouse or, two, the mouse could have escaped.

11:25  25

11:25   1        It is reasonable to think that.  The mouse can get

11:26   2   through any little crevice' so we don't know what happened.

11:26   3        It could have been the cat ate the mouse or it could

11:26   4   have been that the mouse escaped.  So that is an example of

11:26   5   reasonable doubt.

11:26   6        I want to talk a little more about the lack of

11:26   7   evidence.  The Judge has told you over and over again we don't

11:26   8   have a burden.

11:26   9        We have told you he is not guilty.  The Government has

11:26   10   not been able to prove which actually happened; was our client

11:26   11   in the same boat as Ruddy, Calixto, Kathy, Guadalupe and those

11:26   12   who did not know, or was he in the group with these convicted

11:26   13   felons?

11:26   14        We don't really know.  The evidence has proven that he

11:26   15   is in the group with those that did not know.  That is what the

11:27   16   evidence has shown.

11:27   17        Now I want to talk about lack of evidence.  There is

11:27   18   no money trail.  Where is the evidence that Francel Rodriguez

11:27   19   got rich by this scheme?

11:27   20        This is the restitution amount -- and all of these

11:27   21   individuals were ordered to pay this restitution amount.

11:27   22   Mauricio Palma restitution 1.8 million.  Rafael Izquierdo 1.4

11:27   23   million.  1.6 million between the people at Salvus.

11:27   24        Olga, Clara and Roberto -- and Clara told you that

07:41   25   they all got between three to four hundred thousand dollars.

1   Miguel Gonzalez $781,000 in restitution.  Sergio Carratala six

2   hundred fifty plus thousand dollars that he is ordered to pay

3   in restitution.

4           Where is the money?  Let's compare.  The 6,000 first

5   of all did not happen.  Let's assume it did.  Are you going to

6   compare 6,000 to 600,000 and say that proves my client was

7   involved in a fraud.

8           If you are involved in a fraud you make hundreds of

9   thousands of dollars.  If you are ordered to pay restitution

10  that means you are ordered to pay the Government back this

11  money.

12          These are the figures that came out at trial.  Every

13  single one of these people had a private attorney.  And I

14  believe Clara and Olga paid 15,000 to bond out.

15          Mauricio Palma traveled to Brazil, Nicaragua, Spain

16  and Mexico.  Roberto and Rafael said they have been ten times

17  in the last two years.   It is expensive.

18          Did the Government show you any evidence that Francel

19  Rodriguez has a lavish lifestyle, had six hundred fifty

20  thousand dollars in the bank, had any money in the bank?

21          Has the Government shown to you that he traveled to

22  Italy or to Brazil, to Mexico, to Cuba ten times?  It all goes

23  to a lack of evidence and how you can see he is with the people

24  that did not know.  There is no proof he got any money out of

25  this or did this.

11:30  1        The evidence is he made -- he started at nine dollars

11:30  2   an hour and ended up making like twelve dollars an hour.  The

11:30  3   W-2's are in evidence; it is a regular salary.

11:30  4        There is no evidence of a lot of money.  Let's talk

11:30  5   about this cash payment.  There is no evidence it ever

11:30  6   happened.  Roberto said Olga gave him the money.

11:31  7        Roberto did not know if it was cash or check.  Olga

11:31  8   all she said is she gave bonuses to employees.  She never said

11:31  9   she gave any money to him.

11:31 10        Remember the Government tried to tie it up to say the

11:31 11   car, the car; this money was given to Francel Rodriguez to buy

11:31 12   a car.  And that he used this money to buy the car.

11:31 13        That was like the first or second day of the trial.

11:31 14   They showed a cash receipt from the car when he bought the car.

11:31 15   Let's look at that.

11:31 16        They showed you this, Government's Exhibit 6.  They

11:31 17   highlighted this through Special Agent Butcher as a cash

11:32 18   receipt.

11:32 19        They did not show you the next one that shows a

11:32 20   processed Visa card.  It has a signature, it says Francel

11:32 21   Rodriguez, and it is a thousand dollars.

11:32 22        This is on a credit card, a Visa.  I think they showed

11:32 23   you this also, another cash receipt; but then again they didn't

11:32 24   show you this, another credit card.  This one is a debit card

11:32 25   number 2004.

1    This is unbelievable that they come in here and try to

2    claim my client paid cash for a car when he didn't.  This is in

3    the evidence that they gave you.

4    He used a debit card for $2,000 and a credit card for

5    $3,000; and they come in and try to tell you that he is

6    involved in a major fraud conspiracy.

7    It is unbelievable that the Government would present

8    this and claim this is a smoking gun, that he bought a car in

9    cash from Olga.

10   Olga did not say that.  The proof is here; he did not

11   pay that in cash.  He used a debit and credit card which is

12   what a hard working guy would do.

13   All of that, lack of evidence.  There are no banks

14   records.  Again, lack of evidence.  He did not flee.  No text

15   messages, no e-mails, no phone recordings, no audio recordings,

16   no paper trail.

17   It shows he is not guilty.  We presented to you some

18   character witnesses.  We presented Ania Vinoly and Orlando

19   Sautie.  And, yes, they are his friends.

20   They have known him a long time, they have known him

21   from Cuba.  She is an architect in the community.  There is no

22   evidence she has ever been convicted of anything.  There is no

23   evidence she's involved in fraud.

24   Orlando Sautie the same thing; he is a chef at a

25   hotel.  He is hard working.

1        Both of them said our client was an honest and hard

2  working law abiding guy.  They don't go to his job and know

3  what he was doing every day.

4        But those two witnesses who had known my client a long

5  time -- they said that he was an honest guy compared to these

6  seven convicted felons.

7        Again, he did not live an extravagant lifestyle.  He

8  did not flee.  He pled not guilty and is here before the Court

9  and a jury to have his day in court.

10       I am wrapping up.  This is my last opportunity to

11 speak with you.  I have to sit down and the Government will get

12 back up to rebut what I have told you.

13       So they may come up and say it sounds like the defense

14 is claiming a big conspiracy and that all seven of the people

15 conspired to frame him.

16       That's not what we are saying.  We are just saying

17 that Francel is the only guy on trial, and for some reason the

18 Government believes because you are an office manager you had

19 to know what was going on.

20       Think about it, an office manager and a secretary.

21 You are the office manager and you run the office.  But a

22 secretary is intimately involved in running an office.

23       Anyone who has worked as a secretary or runs an office

24 knows that your secretary knows everything that is going on and

25 is very instrumental in the business.

08:02  1       They are trying to say that an office manager knows

08:02  2   but that a secretary doesn't know.  For some reason the

11:37  3   Government believes he knows so they brought this case.

11:37  4       We are not saying this is a big conspiracy by the

11:37  5   witnesses, we are just saying the Government got it wrong and

11:37  6   our client did not know.

11:37  7       Again, there is no money trail.  They have not been

11:37  8   able to prove there is a money trial and that he knew or should

11:37  9   have known what was going on.

11:37 10       So we are just saying there is a motive to lie by

11:37 11   these witnesses.  What is important to remember -- again, what

11:37 12   distinguishes Francel Rodriguez from those seven witnesses?

11:38 13       What distinguishes our client from those seven other

11:38 14   individuals and puts our client in this group of people who

11:38 15   were not charged -- who worked there and did super bills --

11:38 16   what is the difference?

11:38 17       I have said it before, but I want to finish with this.

11:38 18   All seven of these people were involved with other frauds at

11:38 19   other clinics, other billing companies, every single one.  So

11:38 20   that is one.

11:38 21       Number two, the money.  All seven of those people --

11:38 22   as I showed you the check with the restitution -- they have to

11:38 23   pay back to the Government.

11:38 24       All seven of those people the Government had evidence

11:38 25   that they benefited from this fraud.

11:39  1          You are not going to commit a Federal health care

11:39  2   fraud making nine dollars an hour.  That is all the Government

11:39  3   has shown you.

11:39  4          Francel Rodriguez is not guilty.  He should go home

11:39  5   and continue his life.  This is an important day for him.

11:39  6   Those witnesses are in custody or going into custody.

11:39  7          Francel Rodriguez is not guilty.  The Government has

11:39  8   not proven its case.  There is so much lack of evidence.  If he

11:39  9   were really guilty they would have the evidence.

11:39  10          There is not one e-mail, bank record, phone record or

11:39  11   anything except for seven people saying that he did it.

11:39  12          Again, those people have a motive to lie.  They all

11:39  13   got money and they all were involved in other frauds.

11:39  14          That is the difference between them and Mr. Francel

11:40  15   Rodriguez.  He is not guilty.  Thank you.

11:40  16          THE COURT:  Mr. Clark, rebuttal.

11:40  17          MR. CLARK:  Thank you, Judge Williams.  Ladies and

11:40  18   gentlemen, I don't think you need to be reminded, but this case

11:40  19   is United States versus Francel Rodriguez.  He is the defendant

11:40  20   who is the subject of your consideration here today.

11:40  21          Not Sergio Carratala, Miguel Gonzalez, Olga Alvorado,

11:41  22   Roberto Perez or Clara Salazarar Vust.  They have had their day

11:41  23   in court, they pled guilty to their charges and they were here

11:41  24   as witnesses.

11:41  25

11:41 1    The other individuals that were depicted on that page,

11:41 2 Rudy Andreu, Betsy and Calixto Telleria and the sister and so

11:41 3 forth are not on trial here.

11:41 4    What evidence was not presented is really not at

11:41 5 issue.  It is all speculation what if this; what if that?  What

11:41 6 if the defendant never stepped foot in Billing USA?  He

11:41 7 wouldn't be here today.

11:41 8    You know why you are here and this defendant is here.

11:41 9 Because the defendant worked and went to Billing USA full-time,

11:41 10 forty hours a week, Monday through Friday, excluding holidays,

11:42 11 for one year, for two years, for three years.

11:42 12    There is nobody in that company who had greater

11:42 13 involvement and exposure to the fraud that took place at

11:42 14 Billing USA than this defendant even more so than Mauricio

11:42 15 Palma who absent himself every month.

11:42 16    He worked there longer than Rafael.  He worked there

11:42 17 longer than Sergio Carratala.  He certainly worked there longer

01:44 18 than these other people who came and went and who we are not

11:42 19 sure what their role was.

11:42 20    He was not the cleaning man, and he was not the

11:42 21 receptionist at the front desk.  He was not the data entry

11:42 22 person that worked there for two or three months.

11:42 23    He was not even Sergio Carratala who worked under him

11:42 24 or Rafael Izquierdo.  Other than Mauricio Palma he was the most

11:42 25 complicit individual in this whole scheme.

This is not the Forrest Gump of prosecutions.  He did not just drop out of nowhere at an opportune time to have this photograph displayed and then absented himself for the other 364 days of the conspiracy in this case.

The Government did not bring these witnesses to court, Sergio Carratala, Rafael Izquierdo; the defendant brought these witnesses because of his activities.

The defendant worked with someone who ran a billing company for which he was convicted of health care fraud.

The defendant served the owners of Salvus, Olga Alvorado and Roberto Perez and provided such good service that they gave him a tip; they gave him six thousand dollars to purchase a car.

My mistake that he used cash to purchase the car.  You heard testimony from Roberto Perez, Sergio Carratala that he was proud of the fact because it was good service and taking care of Salvus and Olga Alvorado and Roberto Perez.

So they gave him money.  And whether he put it in his pocket and paid some other bills and then used a credit card it is all corroborated.

They gave him extra money for his good service, just like the other employees there were paid.

The witnesses who testified were those who worked with the defendant.  They each testified to their own involvement, and they did not elaborate and say more than was necessary or

11:44  1   less than what was necessary.  The defense attorney said during

11:44  2   closing there was no evidence whatsoever in the record of any

11:45  3   actual conversation between any of the other participants and

11:45  4   the defendant indicating a fraud was taking place.

11:45  5          That is not true.  You heard the testimony of Miguel

11:45  6   Gonzalez who came here and testified that during his meeting

11:45  7   with Mauricio Palma the defendant was brought into Mauricio

11:45  8   Palma's office and the same pitch was made as with the other

11:45  9   clinic owners.

11:45  10          Sometimes Mauricio Palma did it on his own and

11:45  11   sometimes with Sergio Carratala -- on that occasion with the

11:45  12   defendant which there was explicit mention of ten percent

11:45  13   versus the six percent option.

02:03  14          And the ten percent option requires that Billing USA

02:03  15   would manufacture these super bills.  And that is of utmost

11:45  16   important, the manufacture of the super bills.

11:46  17          Similar to what the jury instructions say there is not

11:46  18   a written contract involved in joining a conspiracy where

11:46  19   people have a common understanding of breaking the law and join

11:46  20   it.

11:46  21          You heard from the witness stand people don't say,

11:46  22   hey, I would like you to work for my company; I am going to ask

11:46  23   you to commit fraud.

11:46  24          Would they say that to someone they did not trust?  So

11:46  25   someone could go to the FBI and report it.

11:46  1      Rafael Izquierdo testified that he started working

11:46  2  with Mauricio Palma for a period of time and eventually he

11:46  3  understood how the thing worked.

11:46  4      Because he saw the same individuals coming in who did

11:46  5  not look like legitimate business people who would switch names

11:46  6  of clinics even though the identities remained the same of the

11:47  7  participants after Blue Cross shut them down.

11:47  8      He eventually learned what he was doing was fraud.

11:47  9  And Rafael Izquierdo did not run the other direction when he

11:47  10  learned that fraud was taking place.

11:47  11      He was actively participating.  He continued to work

11:47  12  there for eight dollars an hour, nine dollars an hour.  He

11:47  13  remained there two years.

11:47  14      He willingly agreed to commit fraud for what some

11:47  15  would say was a nominal amount of money.  He was happy to do

11:47  16  the work because it was not hard work.

11:47  17      And one thing that struck me about these witnesses,

02:05  18  including the defendant, all of these men except for Mauricio

11:47  19  Palma had other jobs.

11:47  20      Here you had Rafael Izquierdo working as a vet.  And

11:47  21  you had Sergio Carratala working as a valet.  Apparently the

11:47  22  defendant had a job at the airport.

11:47  23      So nine or ten bucks an hour was not enough to make

11:48  24  ends meet; but it did not prevent them from committing fraud.

11:48  25

11:48  1          Sergio Carratala -- Rafael Izquierdo brought the

11:48  2   defendant into the scheme not by accident because they dated on

11:48  3   a site and that he introduced him to Mauricio Palma for the job

11:48  4   of office manager.

11:48  5          Sergio Carratala had a relationship with the defendant

11:48  6   -- it was the defendant that invited Sergio Carratala having

11:48  7   met him at the English class at Miami Dade College to work for

11:48  8   nine dollars an hour.

11:48  9          They did not say to him any more than Mauricio Palma

11:48  10  said to Rafael Izquierdo; we are here to commit fraud at

11:48  11  Billing USA, come join us.

11:48  12         They brought them in, Sergio worked a period of time;

11:48  13  he started part-time and became full-time.  He started seeing

11:48  14  what was taking place at the business.

11:48  15         He saw Olga Alvorado and Roberto Perez have the

11:49  16  business Murado that was shut down by Blue Cross because of

11:49  17  suspicious billing; and lo and behold they are now Salvus.

11:49  18         He saw it because he had access to the Office Ally

11:49  19  website, the amount of money being billed on behalf of these

11:49  20  individual payments up to fifty thousand dollars for a three

11:49  21  month cycle for any given clinic.

11:49  22         Just like the defendant had access to all of that

11:49  23  information.  And the defendant as well as Sergio Carratala

11:49  24  knew the amounts of money being reimbursed.

11:49  25

11:49  1          Nobody knew the money better than the defendant who

11:49  2     was responsible for the accounting.  He saw that Salvus in a

11:49  3     period of one and a half years billed from $6 million for

11:49  4     services.

11:50  5          And, ladies and gentlemen, Sergio Carratala who like

11:51  6     the defendant was working for nine dollars an hour and who did

11:51  7     not have any great background in medical science or how to run

11:51  8     a medical clinic or billing.

11:51  9          It dawned on him that there was something amiss and

11:51  10     that this was not legitimate.

11:51  11          What convinced him of fraud -- that he was engaged in

11:51  12     fraud -- is when Mauricio Palma said to him you are going to

11:51  13     make your own super bills.

11:51  14          As the defendant did -- based upon all of the

11:51  15     testimony of Mauricio Palma and Rafael Izquierdo and Olga

11:51  16     Alvorado and Roberto Perez and Sergio Carratala.

11:51  17          This is the distinction between those who may have

11:51  18     averted and turned their eye because they were just doing the

11:51  19     data processing -- and their sole job was to input the names

11:52  20     and numbers versus the people that were in the know, the

11:52  21     trusted individuals that were trusted to do the fraud.

11:52  22          Not the receptionist who just did data entry.  Not the

11:52  23     people that were part-time that came and went.  Where there was

11:52  24     no testimony at all that they had any complicity in the fake

11:52  25     super bills.

11:53  1        And at the point in time when Sergio Carratala started

11:53  2  preparing the fake super bills, any doubt he had as to whether

11:53  3  this was a fraud went out the window.

11:53  4        Who else made fake super bills?  Francel Rodriguez and

11:53  5  Mauricio Palma.  Those are the people that were charged.

11:53  6        It was clearly guilty conduct when you are making up a

11:53  7  super bill without any file or any representation as to what

11:53  8  services were provided.

11:53  9        Or when you arbitrarily take a piece of paper from

11:53  10  your boss' office and start filling in a name on top based on a

11:53  11  calendar after the defendant had gone to contact the insurance

11:53  12  company to determine how much money or the eligibility there

11:53  13  was on the policy, how much insurance could be tapped for that

11:54  14  particular patient.

11:54  15        The defense has subpoena power.  If Calixto, if Rudy

11:54  16  Andreu, Betsy or the sister had any useful information to

11:54  17  impart, surely they would have been called.

11:54  18        MR. DUNHAM:  Objection, shifting the burden.

11:54  19        THE COURT:  Overruled.

11:54  20        MR. CLARK:  They were not.  On cross examination if

11:54  21  the defense was so darn sure Olga never gave any money

11:54  22  whatsoever for the down payment of the Dodge, why wasn't that

11:54  23  question posed?

11:54  24        It is a minor point.  The tip is a tip.  The witnesses

11:54  25  recalled it was a rather large tip, $6,000, and that the

11:54  1    defendant bought a car; that is the conduct that was discussed.

11:55  2    Focus on the defendant and his actions and these other people

11:55  3    that -- whether they are guilty or not guilty that does not

11:55  4    take away from the defendant's guilt.

11:55  5          As far as the business of profit, I touched on this,

11:55  6    Rafael Izquierdo who is similarly situated -- he made less

11:55  7    money and he committed fraud.

11:55  8          Sergio Carratala made less money; he committed fraud.

11:55  9    Defense tried to make some sort of distinction between those

11:55  10   who went outside and committed additional fraud and therefore

11:55  11   they are guilty and because this defendant did not he is not

11:55  12   guilty.

11:55  13         Ladies and gentlemen, you heard how this company --

11:55  14   how Mauricio Palma no longer wished to run Billing USA.  It was

11:55  15   coming towards the end and he was shutting down the operation.

11:56  16         He enjoyed a good relationship with Sergio Carratala.

11:56  17   Sergio was a loyal employee.  He did not continue to work with

11:56  18   the defendant for one good reason -- as he expressed to Sergio

11:56  19   he knew the defendant was going behind his back with patients

11:56  20   that belonged to Billing USA and giving them to another clinic

11:56  21   owner who was not using Billing USA.

11:56  22         And when the defendant learned of that -- or Mauricio

11:56  23   Palma learned of that -- he severed the relationship.

11:56  24         What did the defendant do after leaving Billing USA?

11:56  25   He was involved in doing work as a tax preparer.

11:56  1          Mr. Rodriguez is no dummy.  He was involved in this
11:56  2     company -- he was not given a low position, he was given a high
11:56  3     position.
11:56  4          That required a lot of different skills.  It required
11:57  5     a lot of intelligence and knowledge.  It was he who took care
11:57  6     of the software; he created the program for Billing USA.
11:57  7          He did the accounting and was responsible for all the
11:57  8     monies coming to Billing USA.  What more important job is there
11:57  9     than that?
11:57  10          And it was he who was given the responsibility to
11:57  11     represent this company and take care of the business when
11:57  12     Mauricio Palma was involved, which necessarily meant when
11:57  13     Mauricio was gone and when a clinic owner had an issue about
11:57  14     billing or double billing or the amount of money that was being
11:57  15     collected, who did they turn to, they turned to the defendant.
11:57  16          And this business about the restitution amounts; you
11:57  17     know from this indictment some $1.6 million was paid out by
11:58  18     Blue Cross.
11:58  19          Sergio Carratala along with Clara Salazarar Vust,
11:58  20     Roberto Perez, Olga Alvorado are responsible for that because
11:58  21     that money was lost through a Federal Healthcare Benefit
11:58  22     program.
11:58  23          And they are all collectively responsible for that
02:21  24     loss.  And the Government has proved it through the testimony
02:21  25     and evidence that has been presented.

1   And so when defense counsel stands up and says, well,

2   the agents could have done this or that or should have done

3   this or that; I would submit that the agents involved in this

4   case and who conducted their investigations did an exemplary

5   job of putting together this case and in bringing to justice

6   those individuals who were complicit and had first-hand

7   knowledge of everything that took place.

8   And what has been presented clearly provides you with

9   more than an ample basis to convict the defendant for knowingly

10   and willfully participating in this scheme to defraud.

11   And I ask you to return a verdict of guilty as to

12   Francel Rodriguez for each of the counts in the indictment.

13   Thank you for your time and attention throughout this

14   trial.

15   THE COURT:  All right. Ladies and gentlemen, it is now

16   finally time for you to go back and begin your deliberations in

17   this case, and I will excuse you now for that purpose.

18   I am going to ask you, Ms. Garzon, to stay behind.

19   JURY EXCUSED TO BEGIN DELIBERATIONS

20   THE COURT: Ms. Garzon, as you probably guessed you are

21   our alternate in this case, meaning that you will not be going

22   back to deliberate at this time.

23   I am, however, going to ask you to keep in touch with

24   us by phone, just in case your services are needed.

25

1          Should one of the other jurors become ill or is not

2   able to continue their deliberations you would be asked to come

3   back and begin deliberations from scratch with the rest of the

4   jurors.

5          So we would ask you keep in touch with us by phone in

6   case we need you to come back in. And so I would ask you not to

7   talk about the case for a reasonable amount of time.

8          Please feel free to call chambers to find out what is

9   going on with the case.

10          And I have a certificate of service for you which

11   expresses the Court's thanks and the parties' thanks for your

12   attention, your patience, and for your commitment to us.  We

13   thank you very much.

14                          ALTERNATE EXCUSED

15          THE COURT:  All right.  Counsel, if you would just go

16   through the exhibits again to make certain that the appropriate

17   evidence is being sent back to the jury.

18          MR. CLARK: Yes, Your Honor.

19          MS. LOMAX: Yes, Your Honor.

20          THE COURT:  All right. You will be excused for lunch

21   while the jury has their lunch. I take it we have your contact

22   information; so as long as you are within five or ten minutes

23   you can go to lunch.

24          MR. CLARK: We gave it to your deputy, Your Honor.

25          MR. DUNHAM:  We did as well, Your Honor.

12:05  1          THE COURT:  All right. Have your phones close by just

12:05  2  in case there is a question and we need to reach out to you.

12:05  3                      COURT IN RECESS

02:19  4          THE COURT:  All right. We are back on United States

02:19  5  versus Rodriguez.  I have put at counsel table the note we

02:19  6  received from the jury.

02:19  7          It reads as follows:: In Counts 2 through 4 are there

02:19  8  specific information or clarification for each, to distinguish

02:19  9  the difference of each count?

02:19  10         Signed Edward Ercilla.

02:19  11         All right. I will hear from counsel

02:19  12         MR. CLARK:  There is an answer to the question, and I

02:19  13  would refer them to Government's Exhibit 10, which is a chart

02:19  14  of the three substantive counts, and refer them to Government's

02:20  15  Exhibits 11 A and B, which are the patient files for two of the

02:20  16  three counts.

02:20  17         THE COURT:  I will not be referring the jurors to any

02:20  18  particular evidence. I was thinking more in terms of the jury

02:20  19  instructions that they could use in coming to their

02:20  20  determination.

02:20  21         The only one I could think of is on page 23, but even

02:20  22  that would have to be considered not separately but as a whole

02:20  23  with the totality of the instructions.

02:21  24         I am open to any other kind of answer the parties

02:21  25  would like; except one that references the evidence.

02:21 1      MR. CLARK: I think Your Honor could say, you can refer

02:21 2  to all the exhibits in your possession and your collective

02:21 3  recollection of the testimony; giving them a hint.

02:21 4      MR. DUNHAM:  I think page 23 is as responsive as I can

02:21 5  think of in terms of instructions they have. We can tell them

02:21 6  to look at all of the evidence and all of the instructions, but

02:21 7  I would not tell them -- as the Court said -- to look at any

02:21 8  specific evidence or any specific instruction.

02:21 9      You could suggest they look at page 23; but that they

02:21 10  should look at everything as a whole.

02:22 11      THE COURT:  All right.  Here's what I will respond:

02:22 12  You have all the documentary evidence and must rely on your own

02:23 13  recollection of the evidence presented at trial.

02:23 14      I refer you to page 23 of the instructions, but I

02:23 15  remind you that you must consider this instruction along with

02:23 16  all the others.

02:23 17      MR. DUNHAM: I think that's fine, Your Honor.

02:23 18      MR. CLARK: I concur, Judge.

02:23 19      THE COURT:  I will then write this out and send out

02:23 20  copies.  I suggest you stay close by.

02:24 21      MS. LOMAX:  Just to make sure we don't make a mistake

02:25 22  -- I believe in the final instructions that were printed it was

02:25 23  page 22 because of the error with the duplicate page this

02:25 24  morning.

02:25 25      THE COURT:  Good point. Let me take a look at that. It

02:26  1    is page 22. Thank you for catching that, Ms. Lomax.

02:26  2                 COURT SECURITY OFFICER:  All rise.

02:26  3                        COURT IN RECESS

02:52  4         THE COURT:  We are back on United States versus

02:52  5    Francel Rodriguez. There was another question while I was

02:53  6    conducting my sentencing.  It is a very simple question.

02:53  7         The question is, can we please have a copy of the

02:53  8    indictment, which of course in our instructions we refer to on

02:53  9    page eight, but it did not go back to the jury.

02:53  10        All right. I am having a redacted copy of the

02:53  11   indictment prepared where we take out the forfeiture provision

02:53  12   and the foreperson's name.

02:53  13        My proposed answer is, yes, I am sending you a copy of

02:53  14   the indictment. Is that fine Mr. Dunham, Ms. Lomax, Mr. Clark?

02:54  15        MS. LOMAX: Yes, Your Honor.

02:54  16        MR. CLARK:  Yes, Your Honor.

02:54  17        THE COURT:  All right. I think you should all stay on

02:54  18   the floor.  I have another matter at three o'clock, but you can

02:54  19   stay in the courtroom until that time.

02:54  20                        COURT IN RECESS

03:59  21        THE COURT:  We are back on the record in United States

03:59  22   versus Francel Rodriguez; we are all assembled.

03:59  23        We have received our final note indicating we have our

04:00  24   verdict. Is everyone ready to proceed?

04:00  25        MR. CLARK: Yes, Your Honor.

04:00  1             MS. LOMAX: Yes, Your Honor.

04:00  2             THE COURT:  Bring in the jury, please.

04:00  3             COURT SECURITY OFFICER:  All rise, please.

04:00  4             THE COURT:  Everyone may be seated.

04:00  5          Mr. Foreperson, I have been advised that the jury has

04:01  6  reached a verdict; is that correct?

04:01  7             THE FOREPERSON:  Yes, Your Honor.

04:01  8             THE COURT:  If you would pass the jury verdict to our

04:01  9  CSO.

04:01  10             THE FOREPERSON:  Yes, Your Honor.

04:01  11             THE COURT:  Mr. Santorufo, if you would please publish

04:01  12  the jury verdict.

04:01  13             COURTROOM DEPUTY:  In the case of United States versus

04:02  14  Francel Rodriguez:  Verdict form, we the jury unanimously find

04:02  15  as follows:

04:02  16          As to Count 1, conspiracy to commit healthcare fraud

04:02  17  and wire fraud; guilty.

04:02  18          As to Count 2, health care fraud; not guilty.

04:02  19          As to Count 3, health care fraud; not guilty. As to

04:02  20  Count 4, health care fraud; not guilty.

04:02  21          So say we all; signed and dated on the third of

04:02  22  August 2018 by the foreperson.

04:02  23             THE COURT:  Mr. Clark, do you wish the jury polled?

04:02  24             MR. CLARK: No, Your Honor.

04:02  25             THE COURT:  Ms. Lomax, Mr. Dunham.

04:02  1          MS. LOMAX: Yes, Your Honor.

04:02  2          THE COURT:  Ladies and gentlemen, when the jury is

04:02  3  polled that means that I will ask each of you individually if

04:02  4  this is your verdict.

04:02  5          Juror number one, is this your verdict?

04:02  6          THE JUROR:  Yes.

04:02  7          THE COURT: Juror number two, is this your verdict?

04:02  8          THE JUROR:  Yes.

04:02  9          THE COURT: Juror number three, is this your verdict?

04:02  10         THE JUROR:  Yes.

04:02  11         THE COURT: Juror number four, is this your verdict?

04:02  12         THE JUROR:  Yes.

04:02  13         THE COURT: Juror number five, is this your verdict?

04:02  14         THE JUROR:  Yes.

04:02  15         THE COURT: Juror number six, is this your verdict?

04:02  16         THE JUROR:  Yes.

04:02  17         THE COURT: Juror number seven, is this your verdict?

04:02  18         THE JUROR:  Yes.

04:02  19         THE COURT: Juror number eight, is this your verdict?

04:02  20         THE JUROR:  Yes.

04:02  21         THE COURT: Juror number nine, is this your verdict?

04:02  22         THE JUROR:  Yes.

04:02  23         THE COURT: Juror number ten, is this your verdict?

04:02  24         THE JUROR:  Yes.

04:02  25         THE COURT: Juror number 11, is this your verdict?

04:02  1        THE JUROR:  Yes.

04:02  2        THE COURT: Juror number 12, is this your verdict?

04:02  3        THE JUROR:  Yes.

04:03  4        THE COURT:  The jury having been polled and a verdict

04:03  5   having been rendered, ladies and gentlemen of the jury I now

04:03  6   excuse you from your service in this case.

04:03  7        I want to again thank you for your service to not only

04:03  8   the parties and to this Court but to the Justice System. As I

04:03  9   told you when we started at the beginning of the week our

04:03  10  System of Justice would not be possible without all of your

04:03  11  participation.

04:03  12       Again on behalf of all of us we thank you for all of

04:04  13  your time and attention and you are now excused.

04:04  14            JURY DISCHARGED.

04:04  15       THE COURT:  Mr. Rodriguez, the jury having found you

04:04  16  guilty as to Count 1 the Court finds you guilty as to Count 1.

04:05  17  I am going to have to set this out a little further for

04:05  18  sentencing until the first week of November. Mr. Santorufo, if

04:05  19  I could have a date in November, please.

04:05  20       COURTROOM DEPUTY:  November first at 2:00 p.m.

       21            TRIAL CONCLUDED.

       22

       23

       24

       25

1                          -   -   -

2                  C E R T I F I C A T E

3          I hereby certify that the foregoing is an accurate

4    transcription of proceedings in the above-entitled matter.

5

6                                      /S/PATRICIA SANDERS

7    _____                  _____

8    DATE FILED                   PATRICIA SANDERS, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25